FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

2004 JUL -8 P 4: 02

CLERK, US DISTRICT COURT

|  |  |  |
|---|---|---|
| ROBERT A. STORY, | X : | Civil No. 8:04-cv-1587-T-23 TBM |
| Plaintiff, | : : | SHAREHOLDER DERIVATIVE COMPLAINT |
| v. | : : |  |
| JOHN KANG, WILLIAM JOHNSON, JAMES KANG, BRIAN McDOUGAL, THIAN-SONG TJOA, and HENRI TCHEN | : : : : : |  |
| Defendants. | : : |  |
| v. | : : |  |
| LIQUIDMETAL TECHNOLOGIES, INC., | : : |  |
| Nominal Defendant | : |  |

X

Plaintiff, Robert A. Story ("Plaintiff"), on behalf of Nominal Defendant, Liquidmetal

Technologies, Inc., ("LQMT" or the "Company"), by his attorney, submits this Derivative

Petition (the "Petition") against the Defendants named herein.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right and for the benefit of

Nominal Defendant LQMT against Defendants for their breaches of fiduciary duty,

abuse of control, insider selling and other violations of law during the period of May 22,

2002 through and including March 30, 2004 (the "Relevant Period").

2.      LQMT, a company which produces metal alloy products, went public through an

Initial Public Offering ("IPO") announced on May 21, 2002. From 1999 to 2001, LQMT

was a company burning through cash, losing over $34 million.  In order to fund the

Company's continued operations, its CEO, John Kang and other LQMT officers loaned money to the corporation. Due to its enormous cash burn rate and lack of viable customers for its product in the near future, Defendants knew that a public offering was the only way to both save the Company from its cash crisis, and salvage their own investment. Indeed, Defendants received $7.8 million in proceeds from the IPO as repayment of these loans.

3.      Throughout the Relevant Period, Defendants issued quarter after quarter of improving financial results, as well as several pending deals to place its metal alloy product with major customers such as Motorola and Sony. These deals failed to materialize due to LQMT's failure to make its product commercially feasible because of its high manufacturing cost. Struggling with the lack of market acceptance for the product, Defendants resorted to fraudulent mans to boost revenue, through a deal with a South Korean metals processing company, Growell Metal. Defendants failed to disclose that LQMT's improving financial results were only made possible through improper revenue recognition practices in violation of Generally Accepted Accounting Principles ("GAAP"). On February 20, 2004, the Company disclosed that it would have to restate revenues for the third and fourth quarters of 2002 and the first quarter of 2003 due to improper revenue recognition.

4.      In response to the news concerning LQMT's previously undisclosed accounting issues, the price of LQMT stock declined precipitously to close at slightly over $3 per share on March 30, 2004, a drop of over 80% from the stock's high. In fact, the full extent of the accounting fraud is still unknown to investor, as LQMT revealed on March

C:\Documents and Settings\david\Local Settings\Temporary Internet Files\Content.IE5\0DINCP6F\Complaint.doc    - 2 -

30, 2004 that due to an ongoing audit it could not timely file its 2003 Annual Report on Form 10-K.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, during the Relevant Period, Defendants maintained their chief executive offices and principal place of business within this District at 100 North Tampa Street, Suite 3150, Tampa, Florida 33602.

7.      This action is not a collusive one designed to confer jurisdiction on a court which it would not otherwise have.

## PARTIES

8.      Plaintiff Story is a resident of the State of Missouri. He is currently, and was at all relevant times, a shareholder of LQMT. Plaintiff's Verification is attached hereto.

9.      Nominal Defendant LQMT is a Delaware corporation. During the time of the acts complained of herein, LQMT's principal place of business was at 100 North Tampa Street, Suite 3150, Tampa, Florida 33602. LQMT recently changed its principal place of business to California. LQMT is a producer of metal alloy coatings for use in cellular phones, medical equipment and other products.

10.   Defendant John Kang is believed to be a resident of the State of California and was at all relevant times LQMT's President, Chief Executive Officer and a member of its Board of Directors.

11.   Defendant William Johnson ("Johnson") is believed to be a resident of the State of California and was at all relevant times LQMT's Vice Chair of its Board of Directors and has been its executive Vice Chair, Technology.

12.   Defendant James Kang is believed to be a resident of the State of California and was at all relevant times a member of LQMT's Board of Directors.

13.   Defendant Brian McDougal ("McDougal") is believed to be a resident of the State of California and was at all relevant times LQMT's Chief Financial Officer.

14.   Defendant Thian-Song Tjoa ("Thian-Song") is believed to be a resident of the State of California and was at all relevant times a member of LQMT's Board of Directors.

15.   Defendant Henri Tchen ("Tchen") is believed to be a resident of the State of California and was at all relevant times a member of LQMT's Board of Directors.

16.   Defendants John Kang, Johnson, James Kang, McDougal, Thian-Song and Tchen will be collectively referred to herein as "Defendants."

17.   The Defendants, as senior officers and/or directors of LQMT exercised their power and influence to cause LQMT to engage in the fraudulent practices complained of herein.

18.   Because of their Board memberships and/or executive and managerial positions with LQMT, each of the Defendants had access to the adverse non-public information about the business, finances, markets and present and future business prospects of

LQMT particularized herein via access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

19.     Defendants had a duty to promptly disseminate accurate and truthful information with respect to LQMT's operations and financial condition or to cause and direct that such information be disseminated and to promptly correct any previously disseminated information that was misleading.

20.     The Defendants, because of their positions with LQMT, controlled the contents of quarterly and annual reports, press releases and presentations to common stock analysts. Each Defendant was provided with copies of the reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non public information available to them but not the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then false and misleading.

21.     Each of the Defendants participated in a fraudulent scheme and course of business that (i) deceived the investing public; (ii) artificially inflated the price of LQMT common stock during the Relevant Period; (iii) caused investors to purchase LQMT common stock at inflated prices; and (iv) concealed and covered-up the true financial condition of LQMT.

## SUBSTANTIVE ALLEGATIONS

22.    On May 22, 2002, LQMT announced its initial public offering of 5,000,000 shares

of its common stock at a price of $15.00 per share, and a registration statement filed

with the SEC was declared effective.

23.    On August 6, 2002, LQMT issued a press release announcing improved financial

results in line with analysts' estimates, entitled "Liquidmetal Technologies Second

Quarter Revenue Grows 110% Versus Second Quarter of 2001; Company Beats

Consensus Estimates for Revenues and Earnings Per share." The press release stated:

> Liquidmetal Technologies (Nasdaq:LQMT) today announced results for its
> second quarter and six months ended June 30, 2002.
>
> For the second quarter, revenue increased 110% to $2.1 million versus
> the second quarter of 2001, exceeding consensus revenue estimates of
> $1.9 million. On a sequential quarterly basis, revenue grew 47% versus
> $1.5 million in revenue for the first quarter of 2002. For the first six months
> of 2002, revenue improved 90% to $3.6 million versus $1.9 million for the
> same period a year ago.
>
> Revenue gains for both the quarter and first half were driven primarily by
> growth in the company's bulk Liquidmetal® alloys business, and from
> strong demand for Liquidmetal coatings products. Growth in bulk alloys
> mainly reflected defense-related research and development revenues
> derived from the company's contracts with the U.S. Department of
> Defense.  The growth is also attributable to revenue form prototyping parts
> for customers working with the company to develop new products in
> anticipation of mass production.   Demand for Liquidmetal coatings
> remained strong from the oil drilling industry as well as other markets
> looking for high-performance coatings for wear and corrosion resistance.
>
> For the second quarter, the company reported a loss from continuing
> operations of ($4.3) million, or ($0.11) per share, beating consensus
> estimates of a loss of ($0.14) per share, and comparing with a loss of
> ($0.7) million, or ($0.02) per share, for the same period in 2001. For the
> first six months of 2002, the loss from continuing operations was ($8.8)
> million, or ($0.24) per share, compared with a loss of ($1.1) million, or
> ($0.4) per share, for the same period in 2001. The loss from continuing

operations was primarily due to expenditures made in SG&A and R&D to support growth of the company's bulk Liquidmetal alloy business.

Including discontinued operations, the company reported a net loss of ($3.2) million for the second quarter of 2002, or ($0.09) per share, compared to a loss of ($3.0) million, or ($0.09) per share, for the second quarter of 2001.

24.    Commenting on the results, defendant Kang stated:

We are pleased with the success of our public offering and with our results from operations for the second quarter. The IPO has allowed us to invest in the scale-up of our manufacturing operations and to strengthen our balance sheet. In addition, we have seen customer interest in our technology increase dramatically as the revolutionary attributes of the Liquidmetal alloy have gained visibility in the marketplace.

25.    On August 14, 2002, Defendants filed a quarterly report on Form 10-Q for the

second quarter of 2002. With respect to Growell Metal, the Company stated:

On July 29, 2002, the Company invested $2,000 in Growell Metal, Inc. ("Growell"), a metals processing company located in South Korea and publicly traded on South Korea's KOSDAQ stock market. The Company acquired an estimated 5% of Growell's outstanding common stock in this transaction. The Company has accounted for this investment as an available for sale security in accordance with SFAS No. 115 Accounting for certain Investments in Debt and Equity Securities. Currently, Growell holds 92,167 shares (or approximately 0.002%) of the Company's common stock.

The Company has engaged Growell to produce Liquidmetal alloy ingots for the Company to purchase and use as a raw material in the production of products and components. During the second quarter of 2002, the Company sold a machine to Growell for $129 to be used in the production of Liquidmetal alloy ingots to be purchased by the Company.

During the second quarter of 2002, the Company provided to Growell Telecom, Inc. ("Growell Telecom"), a public company located in South Korea and an affiliate of Growell, technical support services for $37 and sample production for $23. Prior to June 30, 2002, Growell Telecom issued a purchase order to the Company for production quantities of casing components.

26.    The 10-Q and all of the Company's Relevant SEC filings included certifications

from Kang and McDougall stating:

> Solely for the purposes of complying with 18 U.S.C. 1350,1, the undersigned Chief Financial Officer [CFO] of Liquidmetal Technologies (the "Company"), hereby certifies, based on my knowledge, that the Quarterly Report on Form 10-Q of the Company for the quarter ended June 30, 2002, (the "Report") fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and that information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

27.     On August 12, 2002, LQMT issued a press release announcing third quarter

2002 results. The press release stated:

> Liquidmetal Technologies today announced results for its third quarter and nine months ended September 30, 2002.
>
> Revenues for the third quarter increased 229% to $3.7 million from revenues of $1.1 million in the third quarter of 2001. On a sequential quarterly basis, third-quarter revenues were 70% higher than the $2.1 million reported for the second quarter of 2002. Revenues for the first nine months grew to $7.3 million compared to $3.0 million in the prior year nine-month period, a 141% increase.
>
> The year-over-year revenue growth was attributable to the company's first production shipments of parts manufactured from bulk Liquidmetal® alloy, increased sales of Liquidmetal® alloy coatings, furnace equipment sales, research and development revenues largely derived from ongoing Department of Defense contracts, and revenues related to the prototyping of test products for current and prospective customers engaged in active product development programs with the company.
>
> \*        \*        \*
>
> While gross profit for the third quarter more than doubled on the strength of higher revenues, the gross margin was 30.9% compared to 50.6% in the third quarter of 2001. For the nine months, the gross margin was 39.5% versus 49.4% a year earlier. The margin reduction during the current year periods was an anticipated outgrowth of the shift in the Company's revenue mix towards a greater percentage of bulk alloy business, which carries a lower margin than the higher-margin coatings sales that dominated revenues in the prior year.

28.     Commenting on the results, Kang stated:

> On balance, we are very pleased with the company's third-quarter financial performance and the operational strides we are making as Liquidmetal Technologies transitions into a full-scale manufacturing

company. Our expanded manufacturing facilities in Pyongtaek, South Korea came onstream in September as planned, and capacity there is ramping up to meet demand for the current wave of new commercial products employing Liquidmetal® alloys.

29.    The press release stated:

... the company shipped its first production parts made of bulk Liquidmetal® alloy--an MP3/CD player casing component--to Growell Telecom, Inc. (formerly Jascom Co., Ltd.) in September. Planned September shipments of cellular phone casing components to Samsung Electronics, LG Electronics and Chinese wireless manufacturer TCL Mobile were delayed to accommodate customer-driven product design and launch-schedule changes. Shipments to Samsung began in October, while shipments to LG Electronics and TCL are expected to begin later in the fourth quarter, Kang said.

In late September, as previously reported, Samsung announced the planned launch of its first line of mobile phones--the SCH-X 199--incorporating Liquidmetal® alloy, while also stating its commitment to the application of Liquidmetal technology in a range of consumer electronic products in the future.

30.    Kang added:

Samsung's recent and very visible endorsement of Liquidmetal® alloys is, in our view, indicative of the enormous potential for our technology across a broad spectrum of existing and new product applications. In addition to the products currently in production, our active product development programs with such world- class organizations as LVMH, Ping, Cleveland Golf, Head Sports, Rawlings, Johnson & Johnson, Surgical Specialties, General Dynamics and the U.S. Army underscore the exciting growth opportunities ahead for Liquidmetal Technologies.

31.    On November 14, 2002, Defendants filed a quarterly report on Form 10-Q-which

stated, with respect to Growell:

On July 29, 2002, the Company invested $2,000 in Growell Metals, Inc. ("Growell"), a metals processing company located in South Korea and publicly traded on South Korea's KOSDAQ stock market. The Company acquired 891,100 shares (or approximately 5%) of Growell's outstanding common stock in this transaction. The Company has accounted for this investment as an available for sale security in accordance with SFAS No. 115 Accounting for Certain Investments in Debt and Equity Securities and carries the investment at fair value with the unrealized gains and losses, net of income taxes, reported in other comprehensive income. During the

three months and nine months ended September 30, 2002 the change in fair value of the investment in Growell resulted in an unrealized gain of $182, which is reported in comprehensive income in the accompanying condensed consolidated financial statements. Currently, Growell holds 92,167 shares (or approximately 0.002%) of the Company's outstanding common stock.

Under the terms of a technology transfer agreement, the Company has engaged Growell to produce Liquidmetal alloy ingots for the Company to purchase and use as a raw material in the production of products and components. The agreement is for a two year period beginning in February 2002. During the second quarter of 2002, the Company sold a machine to Growell for $269 to be used in the production of Liquidmetal alloy ingots to be purchased by the Company. Additionally, during the three months and nine months ended September 30, 2002, the Company sold $872 of furnace equipment to Growell to produce the Liquidmetal alloy ingots for the Company. The profit on these sales, $111, was deferred and will be amortized against the cost of sales over the remaining term of the technology transfer agreement between Growell and the Company. During the three and nine months ended September 30, 2002, the Company purchased approximately $410 of Liquidmetal alloy ingots from Growell.

Furthermore, during the three months ended September 30, 2002, Growell Telecom, Inc. ("Growell Telecom"), a South Korean public company and an affiliate of Growell, purchased $724 of casing components for a combination MP3/CD layer and tooling. During the second quarter of 2002, the Company provided to Growell Telecom technical support services for $37. As of September 30, 2002, the total receivable from Growell and entities related to Growell was approximately $1,596.

While the Company was privately held, the Company's chairman exercised a portion of his nonqualified stock options. The Company inadvertently did not collect the federal and state income taxes at the time of the exercise. The chairman has informed the Company that he has since paid all the necessary taxes. Management believes the exposure to the Company for penalties and interest, if any, is insignificant.

32.    On February 20, 2003, LQMT issued a press release touting "Quarterly Revenues of $5.9 Million Exceeded Prior Year by 572% and Grew 61% on a Sequential Quarterly Basis." The press release stated:

Liquidmetal Technologies today announced results for its 2002 fourth quarter and fiscal year ended December 31, 2002.

Revenues for the fourth quarter achieved a nearly seven-fold increase to $5.9 million from revenues of $874,000 in the fourth quarter of 2001. On a sequential basis, fourth-quarter revenues were 61% higher than the $3.7 million in revenues reported for the 2002 third quarter ended September 30. Revenues for the year grew to $13.1 million compared to $3.9 million in 2001, a 238% increase.

33.    Commenting on the results Kang stated:

These results mark an exciting milestone for the company; the start of full production at our new state-of-the-art manufacturing facility. Perhaps more important, they signal our trajectory of growth as we enter 2003. With each passing week and month, we are gaining momentum and demonstrating the viability of our revolutionary material technology in a high-volume manufacturing environment.

34.    The press release further stated:

The revenue gains largely resulted from a sharp rise in volume of products manufactured from the company's proprietary bulk Liquidmetal® alloys. Construction of the company's first full manufacturing plant was completed in September, accelerating the ramp-up of manufacturing capacity and providing a platform for the growth in sales of bulk alloy products and related revenues achieved in the fourth quarter.

The company's bulk alloy segment accounted for 88% of 2002 fourth quarter revenues, while sales of Liquidmetal coatings contributed 12%. This compared to 19% and 81%, respectively, in the prior year fourth quarter, reflecting the company's strategic shift in product mix. Although led by production of parts made from Liquidmetal alloys, bulk alloy segment results also include research and development revenues and furnace equipment sales. Liquidmetal® coatings are sold mainly to the oil drilling and power generation industries as a protective application in extreme- wear conditions.

As expected, higher expenses stemming from the company's rapid scale-up resulted in losses for the fourth quarter and full year. For the quarter, the company reported a loss from continuing operations of $5.9 million, or $0.14 per share, compared with a loss of $2.9 million, or $0.08 per share, in the fourth quarter of 2001. For the year, the loss from continuing operations was $19.9 million, or $0.51 per share, compared with a loss of $5.2 million, or $.15 per share, from continuing operations in 2001. Including the effect of discontinued operations, the net loss for the quarter totaled $6.3 million, or $0.15 per share. This compared with net income of $3.0 million, or $0.09 per share, in the prior-year fourth quarter, which included a non-recurring gain of $5.8 million, or $0.17 per share, from a change in management's estimate of the loss on disposal of a

discontinued, pre-IPO business. For the full year, the net loss included discontinued operations amounted to $18.4 million, or $0.47 per share, compared with a net loss of $23.1 million, or $0.69 per share, in 2001.

Fourth quarter and full year gross profits were sharply higher on the strength of the company's revenue growth; however, gross margins were lower than in the prior year as an anticipated outgrowth of the accelerated shift in product mix toward a greater percentage of bulk alloy sales. Bulk alloy revenues currently carry a lower margin than the substantially higher-margin coatings sales that dominated the company's smaller base of revenues in the preceding quarters and the prior year. As a result, the gross margin was 27.1% in the current fourth quarter versus 54.0% in the fourth quarter of 2001. For the year, the gross margin was 33.9% versus 50.4% in 2001.

Manufacturing during the fourth quarter centered on production of cell phone casing components for Samsung Electronics, as well as prototyping of various products in development with other customers representing the company's four main target markets for its bulk alloy products -- electronic casings, medical devices, sports and leisure products, and defense products.

35.    The press release summarized LQMT's seemingly successful 2002 results and

stated:

Among its significant accomplishments in 2002, the Company

• Successfully completed its initial public offering and on May 22, 2002 began trading of its common stock on the Nasdaq National Market;

• Entered new product development agreements with leading global customers, including TAG Heuer (watch casings and components), LVMH (luxury goods), the U.S. Army/General Dynamics Corporation (armor-piercing ammunition), Surgical Specialties (ophthalmic blades), DePuy Orthopaedics (knee replacement systems) and Lockheed Martin (defense armor systems), while continuing product development programs with Rawlings, Head Sports, PING, Cleveland Golf; Samsung Electronics, LG Electronics, Motorola and the U.S. Department of Defense;

• Achieved an additional $5.25 million allocation for ongoing Department of Defense research and testing of Liquidmetal alloys for defense-related applications;

• Completed construction of its first full-scale manufacturing plant --a state-of-the-art, 166,000 square foot facility in Pyongtaek, South Korea -- in

September 2002 and accelerated the ongoing ramp-up of its production capacity;

• Began mass production of Liquidmetal parts from the newly dedicated plant during the fourth quarter.

36.    Kang added:

While we are gratified by these and other accomplishments, our focus is now on taking Liquidmetal Technologies to dramatically higher levels of operating performance and achieving our objective or profitability in 2003. As we enter 2003, many of our customers are posed to launch their first Liquidmetal products. We are excited by the prospect of multiple Liquidmetal products entering multiple markets and the momentum this will build for our company.

37.    On March 31, 2003, LQMT filed its 10-K for the fiscal year ended December 31,

2002, signed by, among others, Kang and McDougall. The 10-K clearly indicated the

materiality of the Growell contract to LQMT, stating:

During 2002, three customers accounted for 10% or more of our revenue from continuing operations. Revenue from Samsung represented 15%, Growell Metal, Inc. represented 12% and defense-related contracts with three departments of the United States of America represented 10% of revenue from continuing operations for the year ended December 31, 2002. During the years ended December 31, 2001 and 2000, revenue earned on contracts with the United States of America represented less than 1% of revenue.

38.    The 10-K added:

Our investing activity used cash of $24.3 million for the twelve months ended December 31, 2002 primarily for the acquisition of machinery and equipment and for the construction and development of our South Korean manufacturing facility totaling $21.8 million. The remaining $2.5 million used for the purchase of property and equipment during the twelve months ended December 31, 2002 related primarily to the purchase of furniture and furnishings, computer equipment and software. Included in the investing activities for the twelve months ended December 31, 2002 was the investment of $2.0 million in the common stock of Growell Metal, Inc., a South Korean metals processing company. We intend to source a portion of the production of our Liquidmetal alloy ingots through Growell Metal, Inc. to increase our supply and availability of the Liquidmetal alloy ingots used in our manufacturing operations in Korea. We sold 30% of our

investment in Growell Metals, Inc. as of December 31, 2002 for $1.4 million.

On July 29, 2002, the Company invested $2,000 in Growell Metal, Inc. ("Growell Metal"), a metals processing company located in South Korea and publicly traded on South Korea's KOSDAQ stock market. The Company acquired 891,100 shares (or approximately 5%) of Growell Metal's outstanding common stock in this transaction. During the fourth quarter of 2002, Growell Metal's spin-off of its electronics division resulted in the creation of a new company named Growell Electronics, Inc. ("Growell Electronics"). As a result of the spin-off, 30% of the Company's 891,100 common shares of Growell Metal were exchanged for an equal number of shares in the common stock of Growell Electronics. During the year ended December 31, 2002, the Company sold its shares in Growell Electronics for approximately $1,432, which was based on the market price of the stock on the KOSDAQ stock market on the date of sale. This sale resulted in a realized gain of $832 (see Note 20). At December 31, 2002, the change in fair value of the remaining investment in Growell Metal resulted in an unrealized gain of $1,668, which is reported as other comprehensive income in the accompanying consolidated financial statements.

Under the terms of a technology transfer agreement, the Company has engaged Growell Metal to produce Liquidmetal ingots ("ingots") for the Company to purchase and use as raw material in the manufacturing of products and components made of Liquidmetal alloys. The agreement is for a two-year period beginning in February 2002. Under the terms of this cost-plus arrangement, Growell Metal is paid a processing fee plus the cost of the raw materials used to produce the ingots. During the year ended December 31, 2002, Growell Metal purchased $3,270 of raw materials from the Company's own raw material stock to use in the production of the ingots. The Company purchased $3,669 of ingots from Growell Metal during the year ended December 31, 2002. The net profit on the sale of the raw materials sold to Growell Metal is netted against the cost of the ingots purchased from Growell Metal. At December 31, 2002, the Company had a payable to Growell Metal of $90.

During the second quarter of 2002, the Company sold a machine to Growell Metal for $269 to be used in the production of ingots to be purchased by the Company. Additionally, during the year ended December 31, 2002, the Company sold $1,569 of furnace equipment to Growell Metal to produce ingots for the Company. The accumulated profit on these sales, $80, was deferred and will be amortized against cost of sales over the remaining term of the technology transfer agreement between Growell Metal and the Company. During the year ended December 31, 2002, $24 of the deferred profit was amortized into cost of sales. At December 31, 2002, the remaining deferred profit balance was

$56 and the related trade receivable balance due from Growell Metal was $160.

While the Company was privately held, the Company's chairman exercised a portion of his nonqualified stock options. The Company inadvertently did not collect the federal and state income taxes at the time of the exercise. The chairman has informed the Company that he has since paid all the necessary taxes. Management believes the exposure to the Company for penalties and interest, if any, is insignificant.

39.   On April 14, 2002, LQMT issued a press release announcing anticipated first

quarter results. The press release stated:

... on preliminary estimates, revenues are expected to be approximately $6.6 million for its first quarter ended March 31, 2003.

This would represent 12% sequential growth over revenues of $5.9 million in the fourth quarter of 2002 and 340% over revenues of $1.5 million in the prior year first quarter, but is below the $7 million minimum range of revenue guidance previously provided by the company.

The company reported that the number of different bulk alloy parts in production at its Pyongtaek, South Korea manufacturing plant rose during the quarter to eight parts for five products versus two parts in the preceding fourth quarter of 2002, the company's first full quarter of production; however, total volumes of orders for parts in the first quarter were lower than anticipated. The resulting shortfall in revenues from parts manufacturing was partially offset by revenues from Liquidmetal® alloy coatings, ongoing research and development programs, and a significant level of manufacturing equipment sales.

40.   Kang stated:

Our customers and strategic partners are continuing to embrace Liquidmetal alloys across a diverse range of markets, as evidenced by parts currently in prototyping or being readied for production. However, the time from product development to production, and the size of production order volumes, have unfortunately been less predictable than expected. This has been due, in part, to shifting designs and market demand for our customer's products. It also reflects the fact that our material technology is unprecedented and has required additional design and validation steps by our initial customers, who typically are replacing long-standing, incumbent materials with our alloys. We have a solid base of exceptional companies that are excited about Liquidmetal alloy and its application in their products. Our focus is on bringing their products to market as quickly as

> possible while building strategic, long-term relationships with our customers and sustainable value for our shareholders.

41.    On May 1, 2003, LQMT issued a press release reporting 2003 First Quarter

Results. The release stated:

> Revenues for the first quarter were $6.6 million, a 348% increase over revenues of $1.5 million for the first quarter of 2002 and a 12% sequential increase over revenues of $5.9 million in the fourth quarter of 2002.
>
> The company's bulk alloy segment accounted for $5.8 million, or 88% of total revenues, versus $171,000, or 12%, in the prior year first quarter. The prior year contribution from this segment was comprised solely of research and development revenues. The $5.6 million increase was attributable to the addition of manufacturing equipment sales and production of bulk Liquidmetal alloy parts and prototypes that were not a factor in prior year results. Higher R&D revenues stemming from ongoing development contracts with the Department of Defense and U.S. Army for defense-related products and with DePuy Orthopaedics for orthopedic implant products also positively impacted results for the quarter.
>
> We are pleased to report solid growth in our bulk alloy segment versus the prior year and sequentially. These results reflect the positive impact of an expanded business strategy, increased revenues from product development, and the manufacturing of first components for LG Electronics and new parts for Samsung, demonstrating their continued commitment to incorporating Liquidmetal alloy across multiple products.

42.    Kang stated:

> "The reversal in percentage revenue mix between the bulk alloy and coatings segments from the prior year first quarter is a direct outgrowth of the company's planned transition from its original coatings business to the development and manufacture of Liquidmetal alloy parts for OEM customers. The initial focus of this effort has been on four core product areas--electronic casing components, medical devices, sports and luxury goods, and defense--where the superior strength, hardness and processing characteristics of Liquidmetal alloys have attracted a roster of prominent companies engaged in ongoing product development or production. In support of these efforts, the company completed construction of its first manufacturing plant in September 2002. The plant, located in Pyontaek, South Korea, is in close proximity to the company's initial base of customers in the electronic products industry.
>
> During the first quarter, parts and prototype revenues in the bulk alloy segment included shipments of eight different casing components to

Samsung Electronics and LG Electronics. This was an increase from two parts produced in the preceding fourth quarter of 2002, the company's first full quarter of production at the Pyongtaek plant; however, volumes per part and in the aggregate for the first quarter were lower than in the fourth quarter, resulting in a sequential decline in part-related revenues. The revenues from coatings, research and development, and manufacturing equipment sales offset the decline.

Interest in our alloys and development of new products continues to grow. While we are experiencing a longer development-to-production cycle than expected with our parts customers, the number of parts in production during the second quarter is expected to be greater than in the first, and new product and partnership announcements will accelerate in the months ahead," Kang said. He noted that the first quarter announcements relating to product development programs with Lockheed Martin, Raytheon and OQO Inc. In early April, a luxury watch featuring Liquidmetal alloy was debuted by TAG Heuer at the renowned Basel Watch and Jewelry Show, and announcement of product launches by Rawlings and HEAD Sports, among others, are expected in coming weeks.

43.   The release further stated:

Revenues from equipment sales during the quarter included $25 million from the sale of Liquidmetal alloy casting machines to South Korea-based Growell Metal, Inc., a KOSDAQ-listed company, as part of a five-year strategic agreement finalized in March 2003. The agreement provides Growell Metal with the right to manufacture and market an exclusive line of automotive parts made from Liquidmetal alloys for customers in South Korea. Liquidmetal Technologies will receive royalty payments from the sale of Liquidmetal alloy parts produced and sold by Growell.

First quarter gross profit grew to $2.7 million from $781,000 in the prior year, a result of the company's increased revenues; however, gross margins were lower than in the prior year first quarter as a result of the swing in revenue mix toward a much greater percentage of revenues from the company's bulk alloy segment. Bulk alloy segment revenues currently carry a lower margin than the substantially higher-margin coatings sales that dominated the company's smaller base of revenues in the prior year. This effect was partially offset in the first quarter by higher margins from equipment sales and research and development revenues. Gross margin for the quarter was 40.8% versus 53.4% in the first quarter of 2002.

44.   The press release also touted the Growell deal stating:

The agreement with Growell Metal capitalizes on Liquidmetal Technologies' advanced alloy technology and Growell's 30 years of experience die casting products for South Korea-based companies in the

automotive, farm machinery and electronic product industries. It signals a first step in the expansion of Liquidmetal Technologies' business strategy by establishing an alliance with a proven partner to introduce the company's alloy technology into a previously untapped market. It also expands a strategic partnership between the two companies that began in July 2002 when Growell contracted to manufacture alloy ingots at feedstock for Liquidmetal's Pyongtaek, South Korea plant.

This new agreement is a logical progression of our bulk alloy business strategy. Growell has a long history in metal die-casting, extensive experience with our unique alloy technology, and existing relationships with our team of engineers and technical staff. Moreover, their established presence in South Korea's automotive marketplace opens a new market opportunity to Liquidmetal Technologies that might otherwise have taken us years to develop organically.

Recognition of our technology is spreading as we continue product development with our established customers and introduce Liquidmetal alloys to potential new partners across a diverse range of markets. The heightened validation this brings us is generating new inquiries from various strategic third parties interested in joining forces to pursue new product applications or manufacturing processes that would enhance our present resources and market penetration. Our fundamental objective is to make Liquidmetal a pervasive technology. Toward that objective, we will weigh all viable opportunities to accelerate our progress while steadfastly protecting our valuable intellectual property assets.

45.     On July 31, 2003, LQMT issued a press release announcing second quarter

2003 results. The release stated:

Liquidmetal® Technologies, Inc. (Nasdaq:LQMT) today announced results for its 2003 second quarter and six months ended June 30, 2003.

Revenues for the second quarter increased 199% to $6.4 million from revenues of $2.1 million for the second quarter of 2002. On a sequential quarterly basis, revenues were slightly below the $6.6 million generated in the first quarter of 2003, while roughly in line with management's previously announced revenue outlook for the quarter. Revenues for the first six months of 2003 were 260% higher, at $13.0 million versus $4.6 million a year ago.

As outlined during our last quarterly update, we have engaged in intensive efforts to restructure the company's operations and sharpen our product focus in support of our stated objective of achieving profitability in the fourth quarter of 2003," said John Kang, President and Chief Executive Officer. "This involves a rigorous assessment of both our progress and

shortcomings as a still emerging company and resulted in a substantial realignment of our organizational size, facilities, marketing and manufacturing emphasis. With these efforts now largely behind us, we are realizing benefits that we believe will be reflected in our results going forward, beginning with our ongoing third quarter."

46.    Kang recounted the following major restructuring steps undertaken during the

second quarter:

• a company wide headcount has been reduced by approximately 43%;

• unprofitable parts that disproportionately consume plant resources and impact costs are being eliminated from the company's manufacturing and R&D pipeline or phased out as obligations are fulfilled;

• manufacturing and administrative facilities have been consolidated; and

• new pricing and manufacturing feasibility thresholds have been instituted to optimize product development efforts and personnel utilization.

As a result of cost reduction measures, the company incurred approximately $0.8 million in severance, fixed asset write-down, and facility consolidation expenses during the second quarter. Cost of goods sold for the quarter included approximately $1.3 million associated with production of certain unprofitable parts that have now been discontinued and $0.8 million for a part that is being phased out of production. In aggregate, these amounts equaled $2.9 million.

While negatively affecting second quarter results, the restructuring actions have positioned the company for lower operating expense and future growth. Our previously stated target was to achieve 40% lower operating expenses in the third quarter versus our first quarter run rate. We are well on track to reach this goal. At the same time, we have narrowed our manufacturing focus to those products combining the shortest time to market with the highest market opportunities, as we drive to boost revenues on the foundation of a lower cost structure.

The loss from continuing operations in the second quarter totaled $6.3 million, or $0.15 per share, compared with a loss of $4.3 million, or $0.11 per share, in the second quarter of 2002. For the first six months of 2003, the loss from continuing operations was $12.1 million, or $0.29 per share, compared with $8.8 million, or $0.24 per share, for the same period in 2002.

Including discontinued operations, the company posted a second quarter net loss of $6.3 million, or $0.15 per share, compared to a net loss of $3.2 million, or $0.09 per share, for the second quarter of 2002. Net loss

included discontinued operations for the six months was $12.1 million, or $0.29 per share, versus a loss of $8.3 million, or $0.23 per share, for the first six months of 2002.

Second quarter gross profit was $20,000 compared to $957,000 in the same period last year. The corresponding gross margin for the second quarter was nominal, compared with 44.6% in the prior year quarter. Gross profit for the 2003 six months was $2.7 million versus $1.7 million for the first six months of 2002. The six-month gross margin was 20.8% versus a 48.2% gross margin in the prior year six months. In the aforementioned cost reduction measures, the declines in gross margin for the current periods were due to the following factors: a revenue mix of lower-margin business both year-over-year and sequentially; higher unit costs resulting from lower yields on a new cell phone component introduction into production during the second quarter; inadequate pricing on a second cell phone component that has since been re-priced; and a higher percentage of plant operating costs allocated to manufacturing, as opposed to research and development expense during previous quarters as new plant operations were being brought on line. Also affecting comparisons is the fact that prior year revenues were derived mainly from the company's high-margin industrial coatings business, which now represents a comparatively small portion of revenues.

Second Quarter Revenue Highlights

The year-over-year growth in the second quarter was driven by the company's bulk alloy segment, including: sales of proprietary manufacturing equipment by the company's equipment division; production of bulk Liquidmetal alloy casing components for electronic product manufacturers; prototyping of parts for customers in ongoing product development; and revenues from ongoing research and development programs with defense and medical product customers.

Bulk alloy segment revenues totaled $5.7 million, or 89% of total company revenues for the quarter. The company's industrial coatings segment contributed the remaining $0.7 million, or 11%.

Revenues benefited significantly from a new strategic alliance established during the second quarter. In June, the company entered into an exclusive 10-year license agreement with LLPG, Inc., a corporation headed by Jack Cbitayat, a former director of the company. The purpose of the agreement is to accelerate efforts to commercialize Liquidmetal alloys, particularly emerging precious metals-based compositions, in the jewelry and high-end luxury products market. The agreement gives LLPG and its strategic partners in the Swiss jewelry and luxury goods industry to the right to exploit markets for platinum and gold-based amorphous Liquidmetal alloys currently being developed or commercialized by Liquidmetal

Technologies. Liquidmetal Technologies, in turn, will receive royalty payments over the life of the contract on products produced and sold by LLPG. In conjunction with its technology licensing contract, LLPG purchased two proprietary Liquidmetal alloy melting machines and three proprietary Liquidmetal alloy casting machines in the second quarter for a total purchase price of $2.0 million.

47.    The press release added:

Product news during the second quarter included the announcement of an agreement with Sony Corporation to develop a new digital camera featuring a Liquidmetal alloy casing, and the launch of major Liquidmetal branding campaigns by sporting goods manufacturers HEAD Sport and Rawlings. On July 25, HEAD released a new line of HEAD Liquidmetal® tennis racquets, including Andre Agassi's new "weapon of choice", the HEAD Liquidmetal® radical. Rawlings has announced plans to roll out a full line of Rawlings ® Liquidmetal® baseball bats in the Fall of 2003.

These second quarter announcements -- the efforts to restructure our operations and reduce our costs, the growth in number of parts in production and active prototyping, a major new customer relationship, and the addition of a new strategic partner dedicated to promoting Liquidmetal products across a large target market -- underscore our commitment to achieving profitability in the fourth quarter of 2003 while progressing toward our fundamental objective of building the Liquidmetal family of alloys into a pervasive technology," Kang said. "We look forward to building on our renewed foundation and focus."

48.    On August 14, 2003, Defendants filed quarterly report of 10-Q signed by

Defendants which stated:

On July 29, 2002, the Company invested $2,000 in Growell Metal, Inc. ("Growell Metal"), a metals processing company located in South Korea and publicly traded on South Korea's KOSDAQ stock market. The Company acquired 891,100 shares (or approximately 5%) of Growell Metal's outstanding common stock in this transaction. During the fourth quarter of 2002, Growell Metal's spin-off of its electronics division resulted in the creation of a new company named Growell Electronics, Inc. ("Growell Electronics"). As a result of the spin-off; 30% of the Company's 891,100 common shares of Growell Metal were exchanged for an equal number of shares in the common stock of Growell Electronics. During the year ended December 31, 2002, the Company sold its shares in Growell Electronics for approximately $1,432, resulting in a realized gain of $832. In April, 2003, the Company sold its remaining shares in Growell Metal for approximately $2,578, resulting in a realized gain of approximately $1,178 and the reversal of the accumulated unrealized gain of $1,668 which is

reported as other comprehensive loss in the accompanying condensed consolidated statement of operations. Currently, Growell Metal holds 92,167 shares (or approximately 0.2%) of the Company's outstanding common stock.

Under the terms of a supply agreement, the Company has engaged Growell Metal to produce Liquidmetal alloy ingots ("ingots") for the Company to purchase and use as a raw material in the manufacture of products and components made of Liquidmetal alloys. The agreement is for a five-year period beginning in June 2002. Under the terms of this cost-plus arrangement, Growell Metal is paid a processing fee plus the cost of the raw materials used to produce the ingots. During the six months ended June 30, 2003, Growell Metal purchased $2,636 of raw material from the Company's own raw material stock to use in the production of ingots. The Company purchased $3,149 of ingots from Growell Metal during the six months ended June 30, 2002. The net profit on the sale of the raw materials sold to Growell Metal is netted against the cost of the ingots purchased from Growell Metal. At June 30, 2003, the Company had a net payable to Growell Metal of $186 related to these transactions.

During the first quarter of 2003, the Company sold $2,544 of casting equipment to Growell Metal for use in the processing of bulk Liquidmetal alloy products. As part of a five-year strategic agreement finalized in March 2003, Growell Metal has the exclusive right to manufacture and market automotive parts made from Liquidmetal alloys for customers in South Korea. The Company will receive royalty payments from the sale of Liquidmetal alloy parts produced and sold by Growell. At June 30, 2003, the Company had a receivable from Growell Metal of $2,057 related to the sale of this equipment.

During the year ended December 31, 2002, the Company sold $1,569 of furnace equipment to Growell Metal to produce ingots for the Company. The accumulated profit on these sales, $80, was deferred and will be amortized against cost of sales over the remaining term of the technology transfer agreement between Growell Metal and the Company. The agreement is for a two-year period beginning in February 2002. At June 30, 2003, the remaining deferred profit was $32. During the six months ended June 30, 2003, the Company sold $7 of products and services to Growell Metal related to the maintenance of this furnace equipment. At June 30, 2003, the Company had a receivable from Growell Metal of $157 related to the sale of this equipment to Growell Metal.

49.    On October 9, 2003, LQMT issued a press release entitled: "Liquidmetal Technologies Provides Third Quarter Revenue Estimate, Introduces New Operating Strategy Focused on Strategic Partnerships." The press release stated:

Liquidmetal Technologies, Inc. (Nasdaq:LQMT) today provided a revised revenue estimate for its third quarter ended September 30, 2003, and announced a significant change in its operating and market focus.

Full details of third quarter results will be announced on October 30; however, based on preliminary results, the company today said it expects revenues for the third quarter to be in the range of $3.2 to $3.5 million. This compares to revenues of $3.7 million generated in the same quarter of 2002 and $6.4 million recorded in the 2003 second quarter.

The Company noted that revenues in the preceding second-quarter benefited from a one-time, $2.0 million sale of Liquidmetal® alloy processing machinery as part of a new strategic partnership, and that there were no comparable machine sale transactions in the just-ended third quarter. Second quarter 2003 revenues also included $1.5 million in sales of other manufacturing equipment by the company's equipment manufacturing division. Sales of this type of equipment were significantly lower in the third quarter. In addition, revenues for the third quarter were below previous company guidance of $6.4 million as a result of various factors, the largest of which were lower-than-expected shipments of cellular hone casing components and a less-than-anticipated revenue-increase from the company's coatings segment. The shortfall in casing component shipments was largely due to a company-driven decision to halt production of a large customer order that was determined could not be manufactured at planned costs, as well as cancellation of another large volume order as a result of a customer-driven decision to discontinue a cell phone model.

Modified Business Strategy

In addition to providing revised revenue guidance, the company announced a major shift in its operating strategy. Key elements of the modified strategy are:

•      Manufacturing of casing components for mass-market cell phones has been unprofitable and is being sharply curtailed. Future production of electronic casing components will be limited to select products that require the high-performance qualities of Liquidmetal alloys and can be priced accordingly.

•      In keeping with this emphasis on performance-driven product opportunities, internal manufacturing and marketing emphasis will be focused on higher-margin, value-added products in the company's targeted sports and medical markets; Strategic partnerships, principally in the form of technology licensing and product distribution relationships, will be aggressively pursued with industry partners whose resources, market position and established technologies or processes will facilitate more

rapid and effective development and commercialization of new products employing Liquidmetal alloys. This will enable the company to operate on a less capital-intensive basis than under its previous internal-only manufacturing strategy.

"We initially targeted the mass-production call phone casings market because of its potential for high product volumes and branding opportunities; however, current manufacturing process limitations, higher-than-expected production costs, unpredictable customer adoption cycles, short product shelf life, and intense pricing pressures have made it difficult to compete profitably in this commodity-driven market at this stage of our company's evolution," said Chairman and CEO John Kang.

"Our revised strategy addresses the reality that our unpredictable technology is still new in the marketplace, and that while we have made great progress in developing and improving our proprietary processes over the past year, they are not yet refined to the point that we can cost-effectively manufacture price-sensitive, commodity products. Our core competency is alloy development, and we believe that a business model heavily weighted to funded, strategic partnerships will provide a more direct path to revenue growth and success," Kang said.

In support of this transition, the company is intensifying cost improvement programs initiated in previous quarters that to date have substantially reduced operating expenses. Further cost reduction actions are planned in the current fourth quarter to more fully align expenses with the company's limited near-term manufacturing focus.

To further support these initiatives and strengthen its cash resources, the company reported that it is actively exploring potential sources of funding in the form of equity or debt financing.

Going forward, funded research and development activities, principally for defense-related and medical products, and stable demand for the company's coatings products are expected to continue to provide a baseline of revenues. However, the company said that while it continues to progress with development of sports and medical products, the timeframe for bringing these products to market is being extended.

As an outgrowth of this timing shift, the company said it no longer expects to reach profitability in the fourth quarter of 2003. Profitability will continue to be a primary focus on operations, and with the deployment of the modified business strategy, the company will make further statements about its outlook for reaching profitability when appropriate.

50.     On October 30, 2003 LQMT announced results for its 2003 third quarter and nine

months ended September 30, 2003. The Company stated:

> Revenues for the third quarter were $3.5 million compared with $3.7 million in the third quarter of 2002. Revenues for the first nine months of 2003 were $16.5 million compared with $7.3 million in the prior year period.
>
> The company's bulk alloy segment contributed $2.6 million, or 75% of total revenues for the third quarter, versus $2.4 million, or 66% in the prior year quarter, principally on the strength of higher R&D revenues from ongoing defense-related and medical product development contracts, as well as a modest increase from the sale and prototyping of parts manufacturing from bulk Liquidmetal® alloys. Revenues of the company's coatings segment, at $0.9 million, or 25 percent of the third quarter total, increased sequentially from the 2003 second quarter but compared unfavorably to revenues of $1.2 million, or 34% in the year-earlier period. Prior year results included a large costing sale for a power industry project.
>
> As announced on October 9, the company is currently pursuing a modified business strategy that sharply curtails its previous focus on mass-market, commodity cell-phone components and limits internal manufacturing activities to premium products that command price based on the high-performance attributes of Liquidmetal alloys. In addition, the company reported that it intends to pursue strategic partnerships, principally in the form of technology licensing, joint development and product distribution relationships, to facilitate more rapid and effective commercialization of new products utilizing its amorphous alloy materials.
>
> Commenting on the modified strategy, Chairman and Chief Executive Officer John Kang said, "Over the past year our alloy technology has attracted product development efforts with world class companies in each of our principal product focus areas -- medical, sports and luxury, electronics and defense. From this experience, we believe a heightened emphasis on strategic transactions that leverage the resources, market strength and technologies of outside partners can create valuable new opportunities both within and beyond the boundaries of these four target markets, while enabling the company to operate on a much less capital-intensive basis than our previous, internal-only manufacturing model."
>
> In support of this strategic transition, as previously reported, the company is engaged in extensive cost improvement measures to align operating costs with its reduced manufacturing profile and to further optimize cash resources

Third-quarter operating expenses reflected the initial impact of recent cost improvement programs. Operating expense totaled $6.1 million, or $0.15 per share, compared with a loss of $5.2 million, or $0.13 per share, in the third quarter of 2002. For the first nine months of 2003, the loss from continuing operations was $18.2 million, or $0.44 per share, compared with $14.0 million, or $0.37 per share, for the same period in 2002.

Net loss for the 2003 third quarter totaled $6.1 million, or $0.15 per share, compared to a net loss (including discontinued operations) of $3.8 million, or $0.09 per share, for the third quarter of 2002. Net loss for the nine months was $18.2 million, or $0.44 per share, versus a net loss (including discontinued operations) of $12.0 million, or $0.32 per share, for the first nine months of 2002.

51.   On November 14, 2003, Defendants filed a 10-Q which stated:

On July 29, 2002, the Company invested $2,000 in Growell Metals, Inc., ("Growell Metal"), a South Korean metals processing company which is publicly traded on South Korea's KOSDAQ stock market. The Company acquired 891,100 shares (or approximately 5%) of Growell Metal's outstanding common stock in this transaction. During the fourth quarter of 2002, Growell Metal's spin-off of its electronics division resulted in the creation of a new company named Growell Electronics Inc. ("Growell Electronics"). As a result of the spin-off, 30% of the Company's 891,100 common shares of Growell Metal were exchanged for an equal number of shares in the common stock of Growell Electronics. During the year ended December 31, 2002, the Company sold its shares in Growell Electronics for approximately $1,432, resulting in a realized gain of $832. In April 2003, The Company sold its remaining shares in Growell Metal for approximately $2,578, resulting in realized gain of $1,668, which is reported as other comprehensive loss in the accompanying condensed consolidated statement of operations. Currently, (Growell Metal holds 92,167 shares (or approximately 0.2%) of the Company's outstanding common stock.

Under the terms of a supply agreement, the Company has engaged Growell Metal to produce Liquidmetal alloy ingots ("ingots") for the Company to purchase and use as a raw material in the manufacture of products and components made of Liquidmetal alloys. The agreement is for a five-year period beginning in June 2002. Under the terms of this cost-plus arrangement, Growell Metal is paid a processing fee plus the cost of the raw materials used to produce the ingots. During the nine months ended September 30, 2003, Growell Metal purchased $3,126 of raw materials from the Company's own raw materials stock to use in the production of the ingots. The Company purchased $3,980 of ingots from Growell Metal during the nine months ended September 30, 2002. The net profit on the sale of the raw materials sold to Growell Metal is netted

against the cost of the ingots purchased from Growell Metal. At September 30, 2003, the Company had a net payable of $176 to Growell Metal related to these transactions.

During the first quarter of 2003, the Company sold $2,544 of casting equipment to Growell Metal for use in the processing of bulk Liquidmetal alloy products. As part of a five-year strategic agreement finalized in March 2003, Growell Metal has the exclusive right to manufacture and market automotive parts made from Liquidmetal alloys for customers in South Korea. The Company will receive royalty payments from the sale of Liquidmetal alloy parts produced and sold by Growell Metal. At September 30, 2003, the Company had a receivable of $2,134 from Growell Metal related to the sale of this equipment.

During the year ended December 31, 2002, the Company sold $1,569 of furnace equipment to Growell Metal to produce ingots for the Company. The accumulated profit on these sales, $80, was deferred and will be amortized against cost of sales over the remaining terms of the technology transfer agreement between Growell Metal and the Company. The agreement is for a two-year period beginning in February 2002. At September 30, 2003, the remaining deferred profit was $21. During the nine months ended September 30, 2003, the Company sold $7 of products and services to Growell Metal related to the maintenance of this furnace equipment. At September 30, 2003, the Company had a receivable of $161 from Growell Metal related to the sale of this equipment to Growell Metal.

52. The 10-Q revealed for the first time that there were significant problems with the

Growell deal, stating:

Subsequent to October 31, 2003, the Company received from Growell Metal some updated information regarding the status of Growell Metal's ingot supply operations, and such information suggests that, due to financial challenges associated with the operations, Growell Metal may desire to modify its relationship with the Company. The Company and Growell Metal are currently discussing these issues. As of November 14, 2003, management believes it is too early to determine the outcome of these matters.

53. On December 31, 2003, Defendants issued a press release announcing certain

consolidation measures, stating:

Liquidmetal® Technologies, Inc. (Nasdaq:LQMT) today announced various consolidation measures, including key executive changes, as part of a previously announced shift in the company's operating strategy, as

well as the appointment of a lead independent director by its board of directors.

As reported in October, the company is pursuing a revised operating strategy more heavily weighted toward funded, strategic partnerships -- in the form of technology licensing, joint development and product distribution relationships-- as the principal means of advancing its amorphous alloy technology, as opposed to its previous internal-only manufacturing business model.

The company announced today, as a further advance of this revised strategy and for greater operating efficiency, that it is consolidating all corporate executive and administrative activities into its Lake Forest, California corporate technology center and closing its Tampa, Florida office effective December 31.

Kang noted that the company is proceeding with previously announced cost reduction measures related to the strategy shift that it now expects will produce a quarterly operating expense run rate below $2.5 million in the first quarter of 2004, representing a 71% reduction in quarterly operating expenses versus the first quarter of 2003. These cost improvements are being achieved through a combination of rigorous spending controls, personnel reductions, and the consolidation of facilities.

Operations at the company's manufacturing plant in Pyongtaek, South Korea, are currently focused on production of select, higher-margin cell phone components, principally for long-standing customer Samsung Electronics, and development and prototyping of other premium products that will command pricing based on the high- performance characteristics of Liquidmetal® alloys. Sales of proprietary Liquidmetal® industrial coatings, and ongoing research and development defense industry products, are expected to continue to provide an underlying base of revenues as the company transitions to the revised business model.

54.    On January 15, 2004, Defendants filed a Form 8-K which stated:

The Company previously reported in its Form 10-Q for the third quarter 2003 (filed on November 14, 2003) that it had received from Growell Metal updated information regarding the status of Growell Metal's ingot supply operations. At the same time, Growell Metal had been engaged in the manufacture and supply of Liquidmetal alloy ingots that were sold to the Company for use in the Company's casting operations. As further reported in the third quarter Form 10-Q, the updated information provided by Growell Metal suggested that, due to financial challenges associated with its ingot supply operations, Growell Metal may desire to modify its relationship with the Company.

Subsequently to such disclosure, the Company has been engaged in continuing discussions with Growell Metal regarding the nature and structure of the relationship between the two parties. As a result of these discussions, Growell Metal has indicated that it will discontinue its ingot supply operations and has recently threatened to pursue legal claims against the Company's South Korean subsidiary ("Liquidmetal Korea"). These claims were based on an alleged breach by Liquidmetal Korea of a Product Supply Agreement entered into between Growell Metal and Liquidmetal Korea in June 2002. Although Liquidmetal Korea has denied liability on these claims, because the claims involve complex issues of fact and contractual interpretation, the Company has been unable to predict with any certainty whether a court of law in South Korea would have imposed any liability on Liquidmetal Korea in the event that a legal proceeding would have been commenced, nor could the Company predict the extent of damages that may have been awarded.

In addition to the foregoing, in March 2003, Liquidmetal Korea sold Growell Metal five proprietary Liquidmetal alloy casting machines and granted to Growell Metal a license to use such casting machines to manufacture auto parts for South Korean automobile manufacturers (the "Diecasting Agreement"). Immediately prior to the Settlement Agreement, Liquidmetal Korea had an unpaid account receivable from Growell Metal in the amount of approximately $2.1 million (US) for the purchase of these casting machines. In addition to discontinuing its ingot supply operations, Growell Metal has also recently indicated to the Company that it may discontinue this Liquidmetal casting business. Although Growell Metal had never denied its obligation to pay this outstanding receivable and had not alleged a breach of this Diecasting Agreement, the Company had recently come to believe that, based on the pendency of the dispute under the Product Supply Agreement, the discontinuation of Growell Metal's ingot supply business, and the potential discontinuation of Growell Metal's casting business, there is substantial doubt as to whether the Company would have been able to collect such account receivable.

As a result of the foregoing, the Company determined that it would be in the best interest of the Company's shareholders to settle the foregoing claims and obligations upon the terms and conditions of the Settlement Agreement. The material terms of the Settlement Agreement are as follows:

•   Pursuant to and upon the execution of the Settlement Agreement, Growell Metal has satisfied in full the $2.1 million account receivable to Liquidmetal Korea for the casting machines brought by Growell Metal in connection with the Diecasting Agreement.

•   Pursuant to the Settlement Agreement, Liquidmetal Korea has purchased from Growell Metal approximately $4.9 million in equipment

and materials inventory that was used in Growell Metal's ingot supply operations. Approximately $2.1 million of the purchase price for this equipment has been paid through the offsetting of the $2.1 million casting machine receivable from Growell Metal as described above, while the remaining balance of approximately $2.8 million must be paid by December 31, 2004 in cash or by Company common stock (as decided by the Company). If the amount is paid in Company stock, the stock will be valued for such purpose on the basis of the average closing price of the Company's common stock during the five trading days immediately preceding the date on which the payment is made. The Company intends to use this equipment in its manufacturing operations or its licensing/equipment sales business.

•      The Company and Growell Metal have granted to each other comprehensive mutual releases whereunder all current, prior, and future claims under the Product Supply Agreement and Diecasting Agreement are waived and released, and all other potential prior or current claims between the parties from any other source (whether known or unknown) are also released.

•      The Diecasting Agreement will continue to remain in effect, although all potential claims (including future claims) against the Company are released thereunder. Additionally, in the event that Growell Metal desires to assign its rights under the Diecasting Agreement and sell its casting machines to a third party, the Company will cooperate with Growell Metal in facilitating such assignment. If Growell Metal desires to sell its Liquidmetal casting machines, then the Company must encourage third parties to purchase Liquidmetal casting machines from Growell Metal before the Company tries to sell any of its own casting machines to the third party, provided that the casting machines owned by Growell Metal meet the third-party's specifications.

**Liquidmetal Technologies Announces Private Placement Agreement.**

55.    On February 20, 2004, Defendants revealed for the first time that a restatement would be necessary due to improper revenue recognition methods associated with the Growell deal. The press release issued that day stated:

> Liquidmetal® Technologies, Inc. (Nasdaq:LQMT) today said that it expects to restate revenues for the third and fourth quarters of 2002 and the first quarter of 2003. The revenues relate to sales of alloy melting and casting equipment to a former supplier and licensee with whom the company recently settled a contract dispute, as announced in early January.

The equipment was the subject of a previously reported dispute between a Liquidmetal Technologies subsidiary, Liquidmetal Korea ("LMK") and Growell Metal ("Growell"), a former supplier of alloy ingots to the company's Pyongtaek, South Korea manufacturing plant and also a die casting licensee of the company. Under terms of a January 10 settlement of the dispute, LMK agreed to buyout Growell's investment in alloy inventories, proprietary alloying equipment purchased from LMK, as well as supporting equipment purchased from other suppliers. Also as part of the settlement, Growell satisfied in full a balance owed to LMK for the die casting machines Growell purchased from LMK in the first quarter of 2003 as part of a license agreement to manufacture Liquidmetal alloy parts for the South Korea automotive industry. The contract dispute arose late last year when Growell discontinued its Liquidmetal alloying operations following a decision by Liquidmetal Technologies to sharply curtail its internal manufacturing operations as part of a sweeping change in its business strategy.

The expected restatement of revenues from the equipment sales is a result of an analysis initiated by the company based upon the dispute settlement and a determination that the original revenue recognition decision did not include consideration of at least one agreement identified during a review of the originating transaction documents. The review and analysis indicated that the equipment sales should have been viewed as being contingent upon LMK's continued performance under its agreements with Growell, which would have precluded revenue recognition until the contingent ended.

The sales to Growell, which were previously disclosed in the company's public financial reports, were comprised of $1.7 million of revenue from alloying equipment sales in the third and fourth quarters of 2002 and $2.5 million of revenue from the sale of Liquidmetal die casting machines in the first quarter of 2003. However, an ongoing analysis and review by the company will determine the full extent of the expected restatement and corresponding impact on previously reported results of operations.

The company said it will report on the full extent of the financial restatement upon completion of the analysis.

56.     On March 4, 2004, LQMT issued a press release reporting Preliminary 2003

Fourth Quarter Financial Highlights and 2004 First Quarter Outlook. The press release

stated:

Liquidmetal® Technologies, Inc. (Nasdaq:LQMT), the leading developer of amorphous alloys and industrial coatings, today announced preliminary unaudited financial and operating highlights for the fourth quarter of 2003

and outlook for the first quarter of 2004. Because of its previously announced restatement of revenues for certain prior periods and related financial review, the company said it will report full results for the 2003 fourth quarter and year in conjunction with the filing of its 2003 Annual Report on Form 10-K.

The restatement, as well as the significant consolidation and cost reduction measures undertaken by the company in the new 2003 fourth quarter as part of our well publicized transition to a new operating structure and focus, have made for an extraordinary and complex year-end closing process," said John Kang, Chairman and CEO. "On the one hand, results for the fourth quarter will be significantly impacted by changes associated with the sweeping changes to our organizational and operating structure announced in December as an outgrowth of Revenues for the 2003 fourth quarter are expected to approximate $3.3 million, Kang reported, a level maintained despite the company's decisions to eliminate various unprofitable products from its manufacturing mix during the quarter as part of its modified operating strategy. Revenue comparisons with the prior year are not provided because fourth quarter 2002 revenues are included in the pending restatement.

Fourth quarter operating expenses, before giving effect to charges related to corporate office consolidation, severance, impairments, and other one-time charges, were sharply lower than the $4.7 million in operating expenses in the preceding third quarter, although total fourth quarter operating expenses are expected to be significantly higher than third quarter operating expenses after taking into account these charges. Throughout the fourth quarter, the company continued to engage in extensive programs to reduce costs and streamline its operations through staff and manufacturing headcount reductions, consolidation of facilities-- including the relocation of its headquarters-and more focused product development efforts.

Charges associated with the company's year-end consolidation measures, and their impact on final gross profit and net results, will be reflected in the company's upcoming 10-K filing.

The company entered 2004 clearly benefiting from the streamlining activities of the fourth quarter, Kang said. In particular, operating expenses are expected to achieve a quarterly run rate of approximately $2.6 million for the 2004 first quarter, a 45% reduction from the third quarter of 2003 and 69% below the operating expense of $8.5 million in the first quarter last year. Revenues for the current 2004 first quarter are forecast to be in the range of $3.5 to $4.0 million and continue a positive trajectory throughout 2004.

The company's branding efforts received a significant boost in the fourth quarter when the HEAD® Liquidmetal® line of tennis racquets launched in 2003 was recognized as among the Best Products of the Year by Fortune and Business Week magazines. In addition, a new line of Liquidmetal® baseball and softball bats launched by Rawlings last fall was acknowledged as that company's best bat launch in history, prompting the recent signing of a new three-year exclusive product development agreement with the renowned sporting goods manufacturer. In February, luxury cell phone company Vertu Limited unveiled its new Ascent Collection of mobile phones featuring Liquidmetal® alloys as an integral part of the exterior casing. Also in February, consumer electronics giant Samsung began production of its fifth cell phone model currently employing Liquidmetal alloy hinge housings for superior performance and durability in a critical-wear application.

"We are gratified with this show of confidence in the company's future prospects," said Kang. "Despite the challenges of 2003, including the formidable learning curve associated with launching a new manufacturing company based on a new technology, the one constant value driver of Liquidmetal Technologies is the unprecedented nature of our family of amorphous alloys and their potential to change the paradigm of materials manufacturing and product development."

With a new low cost operating structure, newly strengthened balance sheet, more focused manufacturing and marketing strategies, and the recent high-profile launch of products prominently bearing the Liquidmetal brand, we are clearly excited about our momentum and prospects entering 2004. Our team of marketing, manufacturing, scientific and financial professionals is poised to seek out and capitalize on opportunities for growth and profitability.

The restatement, which the company announced February 20, relates to sales of Liquidmetal alloying equipment to a former supplier and licensee with whom the company settled a contract dispute in January. Included in the restatement are $1.7 million of revenues from alloying equipment sales originally recorded in the third and fourth quarters of 2002 and $2.5 million from the sale of Liquidmetal die casting machines originally recorded in the first quarter of 2003. The company said the ongoing analysis and review expected to be completed later this month will determine the precise extent of the restatement's impact on previously reported results of operations and current forecasts. Details of the restatement will be reported in the company's 10-K filing.

57.    On March 30, 2004, LQMT revealed that it will not file its 2003 Annual Report on

Form 10-K by March 30 as previously anticipated due to "additional time required to

complete a previously announced review and analysis relating to the company's restatement of results for certain prior periods." The press release stated:

> The company said that, as a result of the previously announced restatement process, it has not finalized the financial information to be included in the Form 10-K and has not completed its audit for the fiscal year ended December 31, 2003. The company said it will file its Form 10-K as quickly as possible after completing the restatement process.

> The effect of the restatement will be to eliminate the recognition of revenue on the alloying equipment sales made to Growell in the third and fourth quarters of 2002, and to defer the recognition of revenue on the die casting machine sales made in the first quarter of 2003. The Registrant currently expects that the revenue from the die casting machine sales will be deferred until the first quarter of 2004, which is the quarter during which Growell paid for the die casting machines as a part of the previously announced settlement agreement between the Registrant and Growell. On a preliminary unaudited basis, the Registrant currently expects that the restatement will result in total revenues of $11.5 million for the 2002 fiscal year, a decrease over previously reported revenue of $2.8 million and $5.2 million for the third quarter of 2002 and fourth quarter of 2002, respectively, representing a decrease over previously reported revenues for such period. The registrant does not expect that the restatement will have a material impact on the amount of the Registrant's previously reported net loss for fiscal 2002 or for the third and fourth quarters of 2002.

> On a preliminary unaudited basis, the Registrant also currently expects that the restatement will result in revenue of $4.0 million for the first quarter of 2003, representing a decrease over previously reported first quarter 2003 revenues, and a net loss of $(7.6) million for the first quarter of 2003, representing an increase in the previously reported net loss for first quarter 2003.

58.     On April 29, 2004, LQMT announced that it had received a Nasdaq Staff Determination indicating that its stock was subject to delisting for its failure to file its Form 10-K with the SEC for the period ended December 31, 2003.  The reason given for the failure to timely file the Form 10-K was the ongoing review and analysis related to the expected restatement.

59.    On May 13, 2004, LQMT filed a Form 8-K with the SEC which announced that

LQMT's independent auditors, Deloitte & Touche ("Deloitte"), were resigning.  The Form

8-K stated as follows, in part:

> In connection with the Audit Committee's inquiry into the Growell
> equipment sales and dispute settlement, the Audit Committee also
> reviewed the facts and circumstances relating to a personal stock
> transaction between the Registrant's CEO and Growell.    In this
> transaction, as reported by the CEO, the CEO undertook a private sale of
> personal shares of Registrant common stock to Growell in February 2002,
> prior to the Registrant's initial public offering.  As part of the inquiry, the
> CEO reported that this sale included a previously undisclosed personal
> agreement to ensure that the purchase price of the stock purchased by
> Growell would be at a thirty percent discount to the Registrant's initial
> public offering price, and he also provided information regarding his
> fulfillment of this personal agreement.
>
> As of May 6, 2004, certain details of the foregoing transactions had not
> been resolved to Deloitte's satisfaction, and the audit for the 2003 fiscal
> year has therefore not been completed.  As a result of the expected
> restatements and these unresolved issues, the Registrant's previously
> issued financial statement for the year ended December 31, 2002 and
> Deloitte's audit thereon, as well as the Registrant's quarterly financial
> statements for the third quarter of 2002 and the first, second and third
> quarters of 2003 (and Deloitte's related review reports thereon), should no
> longer be relied upon.
>
> **Deloitte has communicated to the Registrant that it is unwilling to
> continue to rely on the representations of the Registrant's CEO.
> Deloitte has also previously communicated to the Registrant that, in
> light of the facts and circumstances surrounding the expected
> restatement, there were material weaknesses in the Registrant's
> internal    accounting    controls    relating    to    the    execution,
> administration, and accounting for contracts, particularly in the
> Registrant's South Korean operations.** The Registrant has taken and is
> continuing to take steps to improve these internal controls.
>
> (Emphasis added.)

60.    On May 24, 2004, LQMT announced John Kang's intention to resign from the

office of President and CEO upon an appointment of an interim successor to these

positions.  The Company also announced the retention of Stonefield Josephson, Inc. as its new independent auditor.

**Defendants' Statements Were Materially False and Misleading**

61.    Defendants' press releases touting new business deals for its metal alloy product were materially false and misleading because Defendants knew or recklessly disregarded the fact that commercial adoption of LQMT's alloys was extremely slow. For example, Defendants knew but failed to timely disclose that the Company would not be profitable in 2004 because;

> a. Significant sales to Motorola failed to materialize due to the high costs associated with manufacturing cell phone products and unfavorable required pricing;
>
> b. LQMT could not profitably produce parts to fulfill customer orders and was forced to seek customer funded product development, a major shift in its previously announced strategic focus;
>
> c. LQMT's electronic casing components could not be manufactured at commercially viable cost levels, resulting in the cancellation of numerous high-volume orders.

62.    In addition, Defendants failed to disclose that the deal with Growell, which represented an astonishing 43% of LQMT's third quarter 2003 sales, would cause LQMT to restate its previously issued financial statement because the revenue had been prematurely recognized. Indeed, the Company has yet to file its Annual Report on Form 10-K for fiscal year 2003 due to an ongoing audit.

63.    The press releases detailing improved financial results and the SEC filings detailed above were materially false and misleading because of Defendants' fraudulent revenue recognition practices. Defendants were required to cause the Company to disclose, in its periodic filings with the SEC, financial statements, and news releases, the existence of material facts described herein and to appropriately recognize and report expenses in conformity with GAAP. Defendants failed to cause the Company to make such disclosures and to account for and to report expenses in conformity with GAAP.

64.    Defendants knew and ignored, or were reckless in not knowing, the facts which indicated that the above particularized press releases, public statements, and filings with the SEC were materially false and misleading for the reasons set forth above.

65.    SEC Regulation S-X requires that financial statements filed with the SEC conform with GAAP. Financial statements flied with the SEC which are not prepared in conformity with GAAP are presumed to be misleading or inaccurate. [117 C.F.R. § 210.401(a)(1)] The Company's financial statements, which represented that the Company's financial position and results of operations were in conformity with GAAP, were false and misleading for the reasons alleged herein and because they constituted an extreme departure from GAAP. Said financial statements violated the following GAAP concepts among others noted above:

> a. The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Financial Accounting Concepts No. 1).

b. The concept that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Financial Accounting Concepts No. 1).

c. The concept that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Financial Accounting Concepts No. 2).

d. The concept of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Financial Accounting Concepts No. 2).

e. The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASB Statement of Financial Accounting Concepts No. 2).

f. The concept that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (FASB Statement of Financial Accounting Concepts No. 2).

66.    Each and every Form 10-Q which Defendants caused to be filed with the SEC during the Class Period contained a substantially identical representation which stated: "The accompanying unaudited Condensed Consolidated Financial Statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation

S-X.  In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included."

67.     For the reasons set forth above, the financial statements which were contained within each and every Form 10-Q detailed above which Defendants caused to be flied with the SEC did not fairly present the Company's results of operations and financial position in conformity with generally accepted accounting principles because:

a. The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investments, credit and similar decisions was violated. (FASB Statement of Financial Accounting Concepts No. 1).

b. The concept that financial reporting should provide information about an enterprise's financial performance during a period was violated.  (FASB Statement of Financial Accounting Concepts No. 1).

c. The concept that financial reporting should be reliable in that it represents what it purports to represent was violated. (FASB Statement of Financial Accounting Concepts No. 2).

d. The concept of completeness, which means that nothing material is left out of the information that maybe necessary to ensure that it validly represents underlying events and conditions was violated.  (FASB Statement of Financial Accounting Concepts No. 2).

e. The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in

> business situations are adequately considered was violated. (FASB
> Statement of Financial Accounting Concepts No. 2).

> f. The concept that the quality of reliability and, in particular, of
> representational faithfulness leaves no room for accounting
> representations that subordinate substance to form was violated. (FASB
> Statement of Financial Accounting Concepts No. 2).

68.     As a result of these materially false and misleading statements and failures to disclose, LQMT common stock traded at artificially inflated prices during the Relevant Period. The artificial inflation continued until the time LQMT admitted that it was experiencing declining sales and these admissions were communicated to, and/or digested by, the common stock markets.

69.     During the Relevant Period, Defendants materially misled the investing public, thereby inflating the price of LQMT common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

70.     Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal

securities laws.  Defendants, by virtue of their receipt of information reflecting the true

facts regarding LQMT, and its business practices, their control over, and/or receipt

and/or modification of LQMT's allegedly materially misleading misstatements and/or

their associations with the Company which made them privy to confidential proprietary

information concerning LQMT were active and culpable participants in the fraudulent

scheme alleged herein. Defendants knew and/or recklessly disregarded that falsity and

misleading nature of the information which they caused to be disseminated. The

ongoing fraudulent scheme could not have been perpetrated over a substantial period

of time without the knowledge and complicity of the personnel at the highest level of the

Company, including the Defendants.

71.    The Defendants engaged in such a scheme to inflate the prices of LQMT

common stock in order to: (i) protect and enhance their executive positions and the

substantial compensation and prestige they obtained thereby; (ii) enhance the value of

their personal holdings of LQMT common stock including restricted stock.

**Reincorporation From California to Delaware**

72.    In LQMT's Form DEF 14A Proxy Statement for its 2003 Annual Meeting of

Shareholders filed with the SEC on April 15, 2003 ("2003 Proxy Statement"), the Board

of Directors, including John Kang, Johnson, James Kang, Thian-Song and Tchen,

proposed that LQMT change its state of incorporation from California to Delaware.  The

reasons provided in the 2003 Proxy Statement for the reincorporation included the

following:

> Our board of directors believes that it is in the best interests of Liquidmetal
> and its shareholders to change Liquidmetal's state of incorporation from
> California to Delaware and to adopt a new charter and bylaws in
> connection with the reincorporation.   Changing Liquidmetal's state of

incorporation to Delaware will permit us to draw upon well-established principles of corporate governance in making legal and business decisions. The prominence and predictability of Delaware corporate law provides a reliable foundation upon which board and management governance decisions can be based.

*        *        *

**In addition, the proposed reincorporation would permit us to limit the liability of directors and to provide indemnification to our officers, directors, and employees to a degree greater than is presently possible under California law.** We seek to retain the most capable individuals available to serve as officers and directors. The board of directors believes that changing our domicile to Delaware may be a significant factor in attracting such individuals and in encouraging existing directors and officers to continue to serve in these capacities and in freeing them to make corporate decisions on their own merits rather than out of a desire to avoid personal liability. It should be noted, however, that there may be an inherent conflict of interest in the board of directors' recommendation of the proposed reincorporation due to the interest of the members of the board in obtaining the protection of such limited liability provisions.

(Emphasis added.)

73.     Further, in the 2003 Proxy Statement, the board of directors explained certain

differences between California and Delaware corporate law.     Specifically, for

indemnification and limitation of liability, the following difference was noted:

Thus under the California law indemnity provision, a director of Liquidmetal Technologies could be held liable for monetary damages under more circumstances than a director of Liquidmetal Delaware under the Delaware law indemnity provision. **Significantly, the indemnity provision in Liquidmetal Technologies' charter does not limit the liability of our directors for monetary damages as a result of shareholder class action lawsuits, where the indemnity provision in Liquidmetal Delaware's charter will, under certain circumstances, limit such liability.**

(Emphasis added.)

74.     At the time that this proposal was made, Defendants knew of the fraudulent

revenue recognition which occurred in the third and fourth quarters of 2002 and the first

quarter of 2003. As such, they had knowledge of their individual exposure and liability for said actions. The above reincorporation proposal was a method whereby Defendants attempted to limit their known liability and expand indemnification rights at the expense of the Company.

75. As described below, the members of the Board of Directors control more than 50% of the shares of LQMT, and so any board proposal would be guaranteed to pass, regardless of the votes cast by other shareholders. Indeed, LQMT has changed its state of incorporation from California to Delaware.

## DEMAND EXCUSED ALLEGATIONS

76. LQMT's Board of Directors is currently composed of seven (7) directors – John Kang, Vincent Addonisio, William Johnson, James Kang, Thian-Song Tjoa, Henri Tchen, and Dean Tanella. Each of these Directors except for Vincent Addonisio and Dean Tanella have been named as Defendants herein.

77. Defendant John Kang has served as LQMT's President and Chief Executive Officer since June 2001 and as its Chairman of the Board since September 2003. From December 1994 through June 2001, he served as a non-executive Chairman of the Board. John Kang, as a director, owed a duty to LQMT and its shareholders to be reasonably informed about the business and operations of the Company. As CEO, President and Chairman of the Board, John Kang also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company. However, John Kang breached these duties by actively participating

in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.    John Kang is the brother of Defendant James Kang.

78.    Defendant William Johnson has been Vice Chair of LQMT's Board of Directors since June 2000 and has been its executive Vice Chair, Technology, since October 2001.    Johnson, as a director, owed a duty to LQMT and its shareholders to be reasonably informed about the business and operations of the Company.    However, Johnson breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.

79.    Defendant James Kang has served on LQMT's Board of Directors since June 2001 and was Chairman of the Board from December 1994 to September 2003.  Also, from December 1994 to June 2001, he served variously as its CEO and President. James Kang, as an officer and a director, owed a duty to LQMT and its shareholders to be reasonably informed about the business and operations of the Company.  Instead, James Kang breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions. James Kang is the brother of Defendant John Kang.   During the Relevant Period, James Kang engaged in insider trading, disposing of 127,600 shares of LQMT stock for proceeds of approximately $584,000.

80.    Defendant Thian-Song Tjoa has served on LQMT's Board of Directors since 1996.   Thian-Song, as a director, owed a duty to LQMT and its shareholders to be

reasonably informed about the business and operations of the Company. Instead, Thian-Song breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.

81. Defendant Henri Tchen has served on LQMT's Board of Directors since March 2002. Tchen, as a director, owed a duty to LQMT and its shareholders to be reasonably informed about the business and operations of the Company. Instead, Tchen breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.

82. Director Vincent Addonisio has been a member of LQMT's Board of Directors since May 2004.

83. Director Dean Tanella has been a member of LQMT's Board of Directors since March 2004.

84. Defendant John Kang was the beneficial owner of 21.7% of LQMT's shares as of April 15, 2003. Defendant James Kang was the beneficial owner of 14.8% of LQMT's shares as of April 15, 2003. Defendant Johnson was the beneficial owner of 3.1% of LQMT's shares as of April 15, 2003. Defendant Thian-Song was the beneficial owner of 10.4% of LQMT's shares as of April 15, 2003. Defendant Tchen was the beneficial owner of 3.0% of LQMT's shares as of April 15, 2003. Collectively, these Defendants control 53% of LQMT's shares. Collectively, Defendants John and James Kang own 36.5% of LQMT's shares. As such they are, in essence, the controlling members of the Board of Directors.

85.    John Kang receives a base salary from LQMT of $200,000 per year.   James Kang receives a base salary from LQMT of $300,000 per year (up from $193,338 in 2001).   Defendant Johnson receives a base salary from LQMT of $300,000 per year (up from $108,145 in 2001).

86.    In addition, demand on the LQMT Board of Directors to institute this action is not necessary because such a demand would be a futile and useless act, particularly for the additional following reasons:

        a. A majority of the directors of LQMT, as detailed herein, participated in, approved and permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from LQMT's stockholders and are, therefore, not disinterested parties and many are the principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

        b. A majority of the directors had a responsibility and obligation to assure that all press releases and filings of SEC reports and registration statements were accurate and that all financial controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint, however, the Defendant Directors failed to do so, completely abdicating their oversight responsibility to the Company;

c. In order to bring this suit, a majority of the directors of LQMT would be forced to sue themselves and/or persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

d. The acts complained of constitute violations of state law and the fiduciary duties owed by LQMT's officers and directors and are incapable of ratification;

e. The actions of the directors has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands;

f. Any suit by the directors of LQMT to remedy these wrongs would likely expose the Director Defendants and LQMT to further violations of securities laws which would result in additional civil actions being filed against one or more of the Director Defendants; thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves;

g. LQMT has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct which caused the filing of securities class actions against LQMT, nor have they attempted to recover any part of the damages LQMT suffered and will suffer thereby;

h. If the Defendant Directors were to bring this derivative action against themselves, they would thereby expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities law. Such admissions would impair the Company's and their defense of the Class Actions and greatly increase the probability of their personal liability in the Class Actions, in an amount likely to be in excess of any insurance coverage available to the Director Defendants;

i. The Director Defendants are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any, if the Director Defendants initiated action against any of the other Director Defendants named herein. Therefore, LQMT's Board, or any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the Defendants because to do so would result in the loss of their insurance coverage.

87. Plaintiff has not made any demand on the shareholders of LQMT to institute this action since such demand would be a futile and useless act for the following reasons:

a. LQMT is a publicly traded company with thousands of shareholders;

b. Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or telephone numbers of shareholders; and

c.  Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

88.    Plaintiff will adequately and fairly represent the interests of LQMT in enforcing and prosecuting its rights.

## CAUSES OF ACTION

### Count I
### Against all Defendants for Breach of Fiduciary Duty

89.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.    The Defendants owed and owe LQMT fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe LQMT the highest obligation of good faith, fair dealing, loyalty and due care.

91.    The Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

92.    Each of the Defendants had actual or constructive knowledge that they had caused LQMT to improperly misrepresent material facts in its public filings and press releases, that they had failed to conduct proper due diligence, and the other acts complained of herein.  These actions could not have been a good faith exercise of prudent business judgment.

93.    As a direct and proximate result of the Defendants' misconduct, LQMT has suffered and will continue to suffer significant damages.  As a result of the misconduct alleged herein, the Defendants are liable to the Company.

94.    Plaintiff, on behalf of LQMT, has no adequate remedy at law.

### Count II

**Against All Defendants for Abuse of Control**

95.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

96.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence LQMT, for which they are legally responsible.

97.    As a direct and proximate result of the Defendants' abuse of control, LQMT has sustained significant damages, and Defendants are liable to the Company.

98.    Plaintiff, on behalf of LQMT, has no adequate remedy at law.

## Count III
**Against Defendant James Kang for Breach of Fiduciary Duties for
Insider Selling and Misappropriation of Information**

99.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

100.   At the time of the stock sales set forth herein, Defendant James Kang knew the information described above, and sold LQMT common stock on the basis of such information.   The information described above was proprietary, non-public information concerning the Company.

101.   The Company is entitled to the imposition of a constructive trust on any profits Defendant James Kang obtained thereby.

## Count IV
**Against All Defendants for Contribution And Indemnification**

102.   Plaintiff repeats and realleges each and every allegation set forth above.

103.   LQMT is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Defendants' liability to LQMT.

104.   LQMT's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and LQMT is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against LQMT by virtue of the Defendants' misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Against all of the Defendants for the damages sustained by LQMT as a result of the breaches of fiduciary duty and abuse of control;

B.   Equitable and/or injunctive relief as permitted by law;

C.   Restitution and disgorgement of profits;

D.   Attorneys fees and Costs

E.   Any such other and further relief as may be just and proper under the circumstances.

Plaintiff demands a trial by jury.

**DATED: July 1, 2004.**

**LOCAL COUNSEL**

By: _____
David B. Ferebee, 847620
David B. Ferebee, P.A.
P.O. Box 1796
Jacksonville, FL 32201
PHONE   904 358-7001
FAX      904 353-2756

William B. Federman
**FEDERMAN & SHERWOOD**
120 North Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/FAX: (405) 239-2112

and

2926 Maple Ave., Suite 200
Dallas, TX 75201

Attorneys for Plaintiff

## VERIFICATION

I, _Robert A. Story_, declare that I have reviewed the Derivative Complaint ("Complaint") prepared on behalf of Liquidmetal Technologies, Inc. and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Liquidmetal Technologies, Inc. common stock during the time in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_(signature)_
Signature

_25 JUN 04_
Date

_Robert A. Story_
Please Print

Return to:
William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/Fax (405) 239-2112
Email: wfederman@aol.com
Website: www.federmanlaw.com

I:\Pending\LiquidMetal\Derivative\Copy of Verif.doc